

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 17, 2023

**BY ECF**

Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, New York 10007

      Re:    *United States v. Robert Bernardi*, 21 Cr. 616 (PGG)

Dear Judge Gardephe:

      The Government respectfully submits this letter in advance of the sentencing of Robert Bernardi (the "defendant"), and in response to the defendant's sentencing submission, dated January 10, 2023 (ECF No. 70, "Def. Mem."). As explained further below, the Government respectfully submits that a sentence of at least seventy-two months' (six years') imprisonment, which is below the sentence called for by the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G."), should be imposed in this case.

      The defendant committed a brazen fraud that duped scores of investors and lenders into funneling money into his own company, GigaMedia Access Corporation (doing business as "GigaTrust"). The defendant and his co-conspirators doctored documents and forged signatures. They made it appear as if GigaTrust had over $35,000,000 in a bank account, when the bank account truly had only $100. They made it appear as if GigaTrust had up-to-date, clean audit reports, when GigaTrust had not been formally audited. They made it appear as if GigaTrust had the legal blessing of partner at a preeminent New York law firm, when the partner did not even know that his identity had been stolen to assuage potential lenders. And those are just some of the lies that Robert Bernardi told his investors and lenders. Unfortunately, those lies worked—in 2019 alone, the defendant secured, among other investments, a $20,000,000 loan from a national bank (JPMorgan) and a $25,000,000 loan from a commercial financing company (Crystal Financial). Then, in late 2019, after the Government's investigation became overt, the truth was revealed—GigaTrust had no money and hardly any customers. Quickly, nearly all of the employees at GigaTrust lost their jobs, and the company filed for bankruptcy.

      Robert Bernardi was the CEO and founder of GigaTrust. He was also the mastermind of this far-reaching fraud scheme that cost so many people their jobs and their savings. A sentence of at least seventy-two months' imprisonment is necessary to hold him accountable for this conduct.

I.    **Offense Conduct**

Overview

As set forth in the Presentence Report ("PSR"),[1] GigaTrust was a private software company headquartered in Herndon, Virginia, which purported to be a market-leading provider of cloud-based content security solutions that serviced millions of users. The defendant was President and Chief Executive Officer of GigaTrust, which he founded in approximately 2006. Nihat Cardak was GigaTrust's Chief Financial Officer, and Sunil Chandra was GigaTrust's Vice President of Business Development. Both of them worked at the company beginning in approximately 2006.

Bernardi, Cardak, and Chandra, perpetrated a scheme to defraud investors and lenders by inducing them to purchase GigaTrust shares, and loan GigaTrust money, through false and misleading representations. They fraudulently induced victims to invest in GigaTrust and lend money to GigaTrust by, among other things, (a) fabricating and disseminating false and misleading bank account statements that purported to represent GigaTrust's true bank account holdings; (b) fabricating and disseminating false and misleading audit materials that had purportedly been issued by GigaTrust's auditors; (c) forging and disseminating a false and misleading letter purporting to be written by GigaTrust's New-York based counsel; and (d) impersonating and/or causing others to impersonate a purported customer and auditor of GigaTrust on telephone calls with a prospective lender of GigaTrust. As a result of the scheme, investors and lenders lost millions of dollars.

The Fraud

In approximately March 2018, the defendant was introduced to a potential equity investor, a private fund focused on secondary offerings of technology companies ("Investment Firm-1"). In response to diligence requests, the defendant misrepresented the number of GigaTrust customers, GigaTrust's revenue, and GigaTrust's available cash to Investment Firm-1. On June 26, 2018, the defendant emailed a fraudulent audit report and fraudulent financial statements to Investment Firm-1, the latter of which overstated GigaTrust's available cash and revenue by at least over $20 million each. In August and November 2018, Investment Firm-1 invested approximately $8.3 million in GigaTrust, with the majority of investments involving the purchase of GigaTrust stock from the defendant and his family members.

A few months later, in approximately July 2018, GigaTrust sought financing from a New York-based investment firm ("Investment Firm-2"). During initial discussions, the defendant sent Investment Firm-2 financial statements that grossly overstated GigaTrust's revenue by nearly $40 million. After Investment Firm-2 decided to begin a more thorough diligence process, Investment Firm-2 requested, among other things, a copy of GigaTrust's most recent audited financial statements. On October 4, 2018, in response to this request, the defendant, sent fraudulent audited financial statements to Investment Firm-2, which again overstated GigaTrust's 2017 revenue by over $40 million. However, Investment Firm-2 did not make an investment into GigaTrust.

---

[1] The Government understands that the defendant has no remaining objections to the offense conduct section of the PSR in paragraphs 12-24.

January 17, 2023
Page 3

In November 2018, GigaTrust sought financing from JPMorgan. As part of its diligence process, JPMorgan requested that GigaTrust provide JPMorgan with copies of GigaTrust's bank statements from another financial institution (Bank of America or "BOA"). On December 14, 2018, in response to that request, Cardak emailed fraudulent bank statements to the investment banker representing GigaTrust in negotiations, who in turned emailed the fraudulent bank statements to JPMorgan. The fraudulent bank statements overstated GigaTrust's cash deposits by over $25 million. Below is a snapshot of the bank statement that the defendant and Cardak doctored for JPMorgan, which falsely stated that GigaTrust had a $27,584,401.24 balance as of November 30, 2018:



By contrast, below is a snapshot of GigaTrust's actual bank statement as of November 30, 2018, showing a $800,100 balance—over $25 million less cash than the defendant represented to JPMorgan that GigaTrust had on hand:



On January 17, 2019, based in part on GigaTrust's financial condition, as stated in the fraudulent bank statements, JPMorgan entered into a credit agreement with GigaTrust and made $25,000,000 in revolving credit available to GigaTrust.

Less than four months later, on May 8, 2019, JPMorgan issued a notice of default to GigaTrust for failure to comply with post-closing conditions of the credit agreement between GigaTrust and JPMorgan, specifically that GigaTrust make JPMorgan its principal depository bank.  On May 10, 2019, JPMorgan emailed the defendant and Cardak, and demanded that GigaTrust wire $10 million to JPMorgan by May 13, 2019 to maintain the existing relationship. Seeking cash to send to JPMorgan, the defendant immediately approached investors, including a group of existing GigaTrust investors ("Investor Group-1"), to loan money to GigaTrust.  To secure the $10 million demanded by JPMorgan, the defendant falsely represented to Investor Group-1 that JPMorgan had not yet noticed a default to GigaTrust, when in fact JPMorgan had issued a default notice two days earlier.  At the request of Investor Group-1, who sought additional assurances regarding whether GigaTrust was actually in default of its credit agreement with JPMorgan, the defendant and Cardak fabricated a letter purportedly from GigaTrust's counsel (Friedman Kaplan) falsely assuring Investor Group-1 that GigaTrust was not in default.  To do so, the defendant emailed Cardak a copy of the letterhead for a partner at Friedman Kaplan ("Law Firm Partner-1") so that they could use the signature and header to forge a letter for Investor Group-1.  In the email to Cardak below, the defendant specifically stated that he would write the body of the fake letter for Investor Group-1:

| From: | Bernardi, Bob |
|---|---|
| To: | Cardak, Nihat |
| CC: | Bernardi, Bob |
| Sent: | 5/10/2019 4:43:42 PM |
| Subject: | RE: attorney letter |
| Attachments: | JPMorgan Legal Letter.docx |

Nihat,

Here is the letter head from our attorney.  I will write the body and send it to you tomorrow.

Robert Bernardi

That is exactly what happened.  The defendant then sent a fake letter that purported to be signed by Law Firm Partner-1 to Investor Group-1.  The letter, as seen below, falsely claimed that GigaTrust had not been issued a default by JPMorgan:

> Referencing the issue of default, our firm represents that the Company has not been notified of nor issued a default letter by JPM. Additionally, it is our opinion that the JPM Credit Agreement does not restrict the Company from having a depository relationship with any other banking institution, including Gigamedia's current relationship with Bank of America. Therefore, it is our opinion that if the $10 million depository request by JPM is satisfied by Monday, May 13, 2019, then the default issue between the parties will be resolved.

Although the letter was drafted on Friedman Kaplan's letterhead and bore the signature of Law Firm Partner-1, Law Firm Partner-1 did not prepare the letter and was not aware of its existence until shown a copy by the Government.  Between May 10, 2019, and May 13, 2019, GigaTrust's Bank of America accounts received $10,000,000 in wires from private investors, including a $4,000,000 wire from Investor Group-1 on May 13, 2019.  In exchange, the defendant issued a

January 17, 2023
Page 5

$4,000,000 promissory note to Investor Group-1, as well as a $2,500,000 warrant. The defendant also transferred over $2 million shares of GigaTrust preferred stock to Investor Group-1 at no cost. On May 14, 2019, GigaTrust wired $10,000,000 from Bank of America to JPMorgan in response to JPMorgan's demand.

The May 2019 dispute described above with JPMorgan made clear that GigaTrust needed to seek new financing from a different source. In approximately June 2019, GigaTrust began negotiating a $25,000,000 credit facility with a commercial financing company (Crystal Financial). On July 15, 2019, Crystal Financial requested a number of diligence items from GigaTrust, including three calls with GigaTrust customers and a discussion with GigaTrust's purported auditor (Baker Tilly). This ordinary diligence request was problematic, as GigaTrust had few remaining customers and its financials had not been subject to a formal audit. Instead of being forthright, the defendant and Cardak concocted a scheme to impersonate customers and a partner at Baker Tilly, so they could provide false information to Crystal Financial. Specifically, the defendant and Cardak identified an audit partner at Baker Tilly ("Audit Partner-1") to impersonate on a telephone call with Crystal Financial.

In the email below, the defendant asks Cardak to call him on WhatsApp (an encrypted communication service) to discuss Crystal Financial's request for calls with Baker Tilly (GigaTrust's purported auditor) and other GigaTrust "customers":

> From: "Bernardi, Bob" <rbernardi@gigatrust.com>
> Date: 7/18/19 4:28 PM (GMT+03:00)
> To: "Cardak, Nihat" <NCardak@gigatrust.com>
> Subject: Crystal Calls with Baker Tilly and Customers
>
> Nihat,
>
> Can you call me on WhatsApp about Baker Tilly and customer calls.
>
> Robert Bernardi
>
> Chairman & CEO

Instead of confining the discussion to encrypted messaging services, however, in the email exchanges below, Cardak and the defendant discuss which Baker Tilly employee they should impersonate on these calls with Crystal Financial. First, as seen in the top email below, Cardak sent the defendant a link to a particular audit partner at Baker Tilly. In the middle email, the defendant then suggested two different partners who focused on cyber security, the area of GigaTrust's expertise, to which Cardak responded that he would pick a particular partner.

> From: Cardak, Nihat
> Sent: Thursday, July 18, 2019 10:36 AM
> To: Bernardi, Bob <rbernardi@gigatrust.com>
> Subject: Re: Crystal Calls with Baker Tilly and Customers
>
> Here it is for Baker Tilly
>
> https://www.bakertilly.com/contact/directory/patrick-j-fizgerald
>
> Patrick Fitzgerald

January 17, 2023
Page 6

| | |
|---|---|
| From: | Bernardi, Bob |
| To: | Cardak, Nihat |
| Sent: | 7/18/2019 11:04:02 AM |
| Subject: | RE: Crystal Calls with Baker Tilly and Customers |

Nihat,

Look up Mike Vanderbilt and David Ross at BT. Both Principals and focus on cyber security.

| | |
|---|---|
| From: | Cardak, Nihat |
| To: | Bernardi, Bob |
| Sent: | 7/18/2019 11:10:38 AM |
| Subject: | Re: Crystal Calls with Baker Tilly and Customers |

I would pick David Ross

Following these exchanges, the defendant and Cardak caused a co-conspirator ("CC-1") to impersonate the audit partner on a call with Crystal Financial, where CC-1, pretending to be the audit partner, falsely represented that GigaTrust had clean, audited financial statements that did not need major adjustments.

The defendant and Cardak also arranged for Chandra to impersonate a customer of GigaTrust on a call with Crystal Financial. On July 19, 2019, in furtherance of the scheme, the defendant emailed Cardak and stated, "Look at the attached voice changers. Would these or any others work for customer calls. Need your help here." The defendant's email contained an attachment, which contained links to online listings for two electronic voice transformers designed to disguise the sound of a person's voice. The result of following one of the links contained in the email attachment is seen below:



      Shortly after this exchange, on July 22, 2019, Chandra impersonated a customer on the call with Crystal Financial. On that call, Chandra praised GigaTrust's product and told Crystal Financial that he preferred GigaTrust's platform of other IT providers. After Chandra's call with Crystal Financial, Chandra and the defendant discussed paying Chandra a $50,000 bonus with Chandra outlining a proposed payment schedule.

      Days before the $25 million loan was scheduled to close, on July 30, 2019, Crystal Financial requested for the first time that GigaTrust provide one year of bank account statements. After that request, the defendant and Cardak scrambled to prepare additional months of altered bank statements to Crystal Financial, which the defendant eventually transmitted on July 31, 2019. The altered bank statements overstated GigaTrust's bank deposits by approximately $35 million. As seen below, the May 2019 bank account statement (the same month the defendant raised $10 million to assuage JPMorgan's demands) falsely showed a bank balance of $35,986,690.60, whereas the actual Bank of America statement showed a balance of $100. Below is a portion of the fraudulent GigaTrust Bank of America account statement:



Below is a portion of the real GigaTrust Bank of America statement:



In the same email chain where Cardak and the defendant discussed altering these bank statements for Crystal Financial, the defendant also agreed to pay Cardak a $200,000 bonus for his assistance

with the fraud scheme. Specifically, after Cardak told the defendant over email that he was working on altering the bank statements, which would be done in a few hours, Cardak stated, "Just don't walk back on the 200k bonus you promised me," to which the defendant replied, "You got the bonus."

On July 31, 2019, Crystal Financial made a term loan of approximately $25,000,000 to GigaTrust, and, in exchange, GigaTrust pledged shares of GigaTrust stock to Crystal Financial as part of a guaranty and security agreement entered the same day.

To be clear—the defendant's fraud was not limited to merely the select fraudulent misrepresentations outlined above to Investment Firm-1, Investment Firm-2, JPMorgan, Investor Group-1, and Crystal Financial. Rather, on behalf of GigaTrust, investment bankers approached at least approximately fifteen other lenders and investors with the same overstated financials during this same time period. Although none of these other entities ended up loaning money to, or investing in, GigaTrust, each received fraudulent and overstated information about the company's income, revenue, customers, cash—nearly every metric relevant to their investment decisions. At least one of these potential deals for hundreds of million in equity came close to fruition based on the defendant's lies, and the investor only pulled out at the last minute after discovering that a particular customer had not really purchased the GigaTrust product.

On November 27, 2019, as a result of the defendant's fraud scheme and following the Government's investigation into GigaTrust becoming overt, GigaTrust filed for Chapter 7 Bankruptcy protection in the District of Delaware

## II.     The Defendant's Indictment, Plea, and Applicable Guidelines Range

On October 12, 2021, the grand jury returned an indictment charging the defendant with one count of conspiracy to commit securities fraud, one count of conspiracy to commit bank fraud, one count of conspiracy to commit wire fraud, and two counts of aggravated identity theft. The defendant was arrested on October 20, 2021, and the Securities and Exchange Commission ("SEC") filed a separate proceeding that day against the defendant and members of the defendant's family. *See SEC v. Bernardi et al.*, 21-cv-8598 (VM) (S.D.N.Y.). The parallel SEC proceeding alleges that the defendant violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

On August 17, 2022, the defendant pled guilty, pursuant to a plea agreement with the Government, to conspiring to commit securities fraud, bank fraud, and wire fraud. *See* PSR ¶¶ 8, 9. In the plea agreement, the parties stipulated and agreed that, under U.S.S.G. § 2D1.1, the defendant's offense level is 30. *See* PSR ¶ 9. The parties also agreed that his Criminal History Category is I. *Id.* This results in an advisory range of 97 to 121 months' imprisonment. *Id.*[2] Probation recommends a sentence of 48 months' imprisonment.

---

[2] The Probation Department applied an additional 2-level enhancement for the involvement of sophisticated means, and calculated a Guidelines Range of 121 to 151 months' imprisonment. The parties discussed this enhancement and stipulated that it did not apply under the circumstances here.

### III. Discussion

#### A. Applicable Law

Although *United States v. Booker*, 543 U.S. 220, 264 (2005), held that the Guidelines are no longer mandatory, it also held that district courts must "consult" the Guidelines and "take them into account" when sentencing. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After performing that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant," (2) the four legitimate purposes of sentencing, as set forth below, (3) "the kinds of sentences available," (4) the Guidelines range itself, (5) any relevant policy statement by the Sentencing Commission, (6) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

#### B. Analysis

The Government respectfully submits that a sentence of at least seventy-two months' imprisonment is necessary to accomplish the goals of sentencing in this case.

The nature and circumstances of the defendant's offense conduct weigh heavily in favor of a sentence of at least seventy-two months. The instant fraud schemes were incredibly serious and destructive. The conduct here was not aberrational; rather the defendant brazenly committed fraud for years. To perpetrate the scheme, the defendant and his co-conspirators manipulated countless documents; forged signatures of a law firm partners and auditors; doctored bank statements and audit reports; and used voice changers to pretend to be customers on phone calls. During the course of the scheme, the defendant made countless misrepresentations to multiple investors and lenders and ultimately cost all of his employees their jobs, while causing significant financial damage to victims. Not only did everyone at GigaTrust lose their job, but Crystal Financial also

terminated the most senior employee responsible for the deal where Crystal Financial loaned GigaTrust millions of dollars. Such an egregious fraud warrants a substantial term of imprisonment. Nor is there any mitigating role for this defendant. GigaTrust was his company, and the defendant was involved in every fraudulent aspect of this scheme. He was the one asking for the fake bank statements, paying out bonus rewards to his co-conspirators, and buying the voice-changers to make the fake phone calls. A sentence of at least seventy-two months appropriately punishes this conduct.

In his submission, the defendant makes several attempts to mitigate his fraudulent conduct. None of them hold water. The defendant claims that "he did not siphon funds from Giga to finance an extravagant lifestyle." (Def. Mem. 18.) First, that is no excuse to committing fraud. Just because the defendant wanted his company to succeed and believed in his vision does not give him permission to victimize others and lie to obtain money once it became apparent that GigaTrust's business model needed to shift. Second, although the defendant did not appear to take GigaTrust funds for his own lavish lifestyle, Bernardi used his fraud to benefit his family members. As detailed above, Investment Firm-1 provided an $8 million investment into GigaTrust, with the majority of investments involving the purchase of GigaTrust stock from the defendant and his family members. GigaTrust also appeared to employ the defendant's son in some capacity until the company folded in 2019, although it is unclear what role, if any, the defendant's son actually played in the company after 2014. Bernardi's son lived in New Jersey (GigaTrust's offices were in Virginia) and made over $100,000 per year in salary (and also had a consulting contract with the company). Although it might be true that GigaTrust was not funding extravagant purchases by the defendant, he was using his fraud to directly benefit his family.

The defendant next claims that his health issues somehow explain his multi-year fraud scheme. But far from explaining his conduct, it makes it all the more puzzling. It is unclear why a life-threatening diagnosis would push the defendant *towards* committing a brazen fraud instead of away from it. But this explanation for the defendant's fraud is belied by the evidence that the defendant previously was accused of fraudulent statements in a civil lawsuit. GigaTrust is not the first company that the defendant steered into liquidation. In 1999—over 15 years before his diagnoses—the defendant served as the CEO of a company called Musickmaker.com. The company, and the defendant, were accused in a class action lawsuit of committing securities fraud. The complaint alleges that Bernardi made a series of public misstatements in public interviews with CNN, CNBC, and Bloomberg News, and the case was settled. *See In re Musicmaker.com Securities Litigation*, 00-cv-2018 (C.D. Cal.) (ECF No. 127). Just as with GigaTrust, the defendant left this company, and Musicmaker collapsed.

The defendant also claims that his diagnosis will make prison time harder on him than a typical defendant because he likely "will not be able to serve his time as most non-violent, white collar criminals who are first-time offenders do, at a minimum security camp." (Def. Mem. 23.) This argument rests on a number of assumptions about BOP designations, but, more importantly, it reveals the same hallmarks of entitlement that led the defendant to commit the underlying crimes. The defendant believes that he deserves to spend his time in a special "camp" as most first-time offenders do. However, the defendant is not entitled to special treatment just because he committed a non-violent crime. The defendant committed multiple federal crimes, and the BOP will designate him accordingly.

January 17, 2023
Page 11

      To this end, a sentence of at least seventy-two months is necessary to avoid unwarranted sentencing disparities. Such a sentence for this defendant accords with other sentences in this district for similar conduct. In *United States v. Malley*, 21 Cr. 215 (ER), the defendant was the CEO of a real estate firm and committed a fraud that cost investors approximately $58 million. (*See, e.g.*, ECF No. 42.) There, the defendant fabricated his resume, partnerships, and associations, similarly had no criminal history, and faced the same Guidelines stipulation as Bernardi—97 to 121 months' imprisonment. Judge Ramos sentenced the defendant to 60 months' imprisonment. Similarly, in *United States v. Sadleir*, 20 Cr. 320 (PAE), the defendant was the CEO of a film production company and participated in two fraud schemes relating to a $75 million investment, where he created fake identities and forged signatures in furtherance of the schemes. The defendant likewise had no criminal history and faced a stipulated Guidelines range of 108 to 135 months' imprisonment. (*See* ECF No. 81.) Judge Engelmayer imposed a sentence of 72 months' imprisonment, and stressed the need for general deterrence, stating that, "It's important that a message go out to other people who rip off lenders and investors and operate in a host of ways as if the law doesn't apply to them. The message is if you commit such a crime and if you get caught, you'll do real time. It's not a defense that you have a title and assets and that you wear a suit and a tie." (Sent. Tr. at 71-72.)

      A sentence of at least seventy-two months will also promote respect for the law and serve general deterrence. Individuals who engage in white-collar crime often believe the potential for significant financial benefits outweighs the risk that they will be punished. *See United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence. Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." (internal quotation marks and citations omitted)). Accordingly, a sentence of at least seventy-two months is necessary to deter financial fraud.

### IV.  Conclusion

For the foregoing reasons, the Government respectfully requests that the Court impose at least a seventy-two month sentence.

                                                            Respectfully submitted,

                                                            DAMIAN WILLIAMS
                                                            United States Attorney for the
                                                            Southern District of New York

                                                            Peter J. Davis / Emily A. Johnson
                                                           Assistant United States Attorneys
                                                           (212) 637-2468 / 2409

cc:      *Counsel for defendant Robert Bernardi*
          (by ECF)